23CA1783 Peo v Ryan 07-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1783
Arapahoe County District Court No. 22T931
Honorable Ben L. Leutwyler III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Therese Collette Ryan,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHUTZ
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Samantha Almon, Deputy
State Public Defender, Centennial, Colorado, for Defendant-Appellant

¶ 1      Therese Collette Ryan appeals her judgment of conviction for driving while ability impaired (DWAI). We affirm the judgment.

## I.     Background and Procedural History

¶ 2      Ryan's conviction is supported by the following evidence presented at trial.

¶ 3      Just after midnight on February 5, 2022, Officer Michael Lopez pulled Ryan over after observing her crossing, or on, the dividing line between lanes. After stopping her, Officer Lopez observed cans of Cutwater (an alcoholic beverage) in the front passenger seat of Ryan's car, and an empty Cutwater can in a trash bag behind the center console.

¶ 4      Officer Lopez questioned Ryan about what she did prior to her arrest. Ryan stated that she spent the evening with a male companion during which she ate a salad, consumed a vodka tonic, and had sex. She also disclosed that she had a fractured bone in her foot and was on prescribed pain medication which she had last taken at 5 p.m. After questioning Ryan, Officer Lopez asked her to submit to a field sobriety test. Ryan agreed to do roadside maneuvers, after which he arrested her. At the police station, Ryan

took a breathalyzer test which showed a blood alcohol content (BAC) of .066.

¶ 5    Ryan was charged with DWAI, lane usage violation, and failure to display proof of insurance.[1]  The county court set the matter for a jury trial.  In November 2022, a jury convicted Ryan of DWAI and a lane use violation.  After the county court sentenced her, Ryan timely appealed to the district court and moved to stay her sentence pending the outcome of the appeal.

¶ 6    During the appeal to the district court, it became clear that a portion of the county court record central to the appeal was not decipherable.  The district court remanded the case to the county court to settle the record, but those efforts were unsuccessful.  Ultimately, the parties agreed that the record could not be reconstructed, and a new trial was set in the district court pursuant to Crim. P. 37(g).

¶ 7    The district court trial was scheduled to begin on July 17, 2023.  On the evening before the trial, Ryan's counsel moved for a continuance after Ryan provided her with the name and contact

---

[1] The district attorney's office later dismissed the failure to display proof of insurance charge.

information of the previously unidentified man that she had spent the evening with, Steve Davis. The next morning, the trial court denied the continuance motion after concluding that Ryan failed to exercise due diligence in providing Davis's contact information to counsel.

¶ 8 The case proceeded to trial in the district court, and the jury convicted Ryan of DWAI but found her not guilty of the lane violation. The trial court sentenced Ryan to 180 days in jail, which it suspended subject to the successful completion of twelve months of supervised probation, and a $200 fine. Ryan timely appeals the conviction.

## II. Continuance Motion

¶ 9 Ryan claims that the trial court abused its discretion when it failed to continue the trial. We are not persuaded.

### A. Additional Facts

¶ 10 Just after 7 p.m. on July 16 — the evening before the trial — Ryan's counsel filed a motion to continue and contemporaneously endorsed Davis as a witness. Counsel stated that as soon as she learned of Davis's contact information, she scheduled a phone

interview with him.  During the conversation, Davis revealed the following:

- He and Ryan had known each other for approximately two years and were in a casual relationship.

- He drank socially with her "probably three to four" times and had a good sense of Ryan's alcohol tolerance.

- They were together during the afternoon and evening of February 4 (Ryan was arrested shortly after midnight on February 5) at a hotel and watched a movie, consumed drinks, and had sex.

- While they were together, Ryan had two or three drinks that she did not finish, they were not drinking heavily, and "there was not a lot of drinking going on."

- He would have "intervened" and would not have let Ryan drive home if she seemed impaired because he frequently asks his friends and colleagues if they are safe to drive if they have been drinking.

¶ 11    When asked if he could testify at the trial, Davis stated that given the last-minute nature of the request, he could not take time

4

off work, as he was scheduled to fly out of town the next day, but was willing to testify on a future trial date.

¶ 12 The next morning, the parties argued the continuance motion before the trial started. Ryan's counsel argued that granting a continuance was appropriate under the circumstances because this was the only continuance she had requested, Davis was a credible and critical witness, and defense counsel acted diligently as soon as she learned of Davis's contact information. The court inquired whether Ryan's counsel could explain why Ryan had not disclosed Davis's identity for over a year. After consultation with her client, counsel attributed Ryan's failure to disclose Davis's contact information earlier to "personal reasons."

¶ 13 The prosecution objected to a continuance due to the age of the case and argued that Ryan's counsel was on notice of the possibility of Davis's existence because of Ryan's statement at the time of her arrest that she had spent the evening with a man.

¶ 14 The trial court denied Ryan's motion, finding that Davis's testimony would not "add anything or contradict" Officer Lopez's testimony; rather, it would add context to the events leading up to the arrest. And, while acknowledging that Davis's evidence was

"certainly important to the case," the court concluded that the delayed disclosure was not justified because Ryan did not provide Davis's name or contact information until immediately before trial. Based on Ryan's failure to exercise due diligence, the court denied the motion.

### B. Standard of Review and Applicable Law

¶ 15    We review an order resolving a continuance motion for an abuse of discretion in view of the totality of the circumstances. *People v. Roybal,* 55 P.3d 144, 150 (Colo. App. 2001). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, unfair, or based on an incorrect understanding of the law. *People v. Owens,* 2024 CO 10, ¶ 65.

¶ 16    "When the continuance is sought to locate a missing witness, the court may consider whether the movant exercised due diligence to secure the witness's attendance." *People v. Senette,* 2018 COA 105, ¶ 9. "Other factors relevant to the trial court's inquiry include the prejudice the movant would suffer from the denial of a request for a continuance, whether that prejudice would be cured by the continuance, and the prejudice to the nonmoving party if the continuance is granted." *Id.*

## C.    Analysis

¶ 17    Ryan contends that the trial court denied her the right to present a complete defense because only Davis could verify her testimony concerning how much she had eaten and drunk that evening, and the fact that she did not appear intoxicated.  Because the prosecution's case was built on documentary evidence and Officer Lopez's testimony, Ryan argues the prosecution would not have been prejudiced by the continuance.  Ryan also argues that the denial of the continuance left her with no practical alternative but to testify on her own behalf and therefore compromised her right to remain silent.

¶ 18    The People contend that the trial court did not abuse its discretion by denying the motion because Ryan failed to act with due diligence in identifying Davis, endorsing him as a witness, and requesting a continuance.

¶ 19    As it relates to the prejudice inquiry, we agree with Ryan that because Officer Lopez was the prosecution's only witness, and its case was largely based on documentary evidence, the prosecution likely would not have suffered prejudice if the trial court had

granted Ryan's motion. *See Senette*, ¶ 9. However, that is not where our analysis ends.

¶ 20 We also need to consider whether the moving party "exercised due diligence to secure the witness's attendance," and that is where Ryan's claim fails. *Id.* At trial, and on appeal, Ryan does not provide any justification for not informing her counsel of Davis's identity and contact information for over a year, beyond attributing it to "personal reasons." We understand Ryan's desire not to disclose personal information, but she made this choice knowing that Davis was a potentially relevant witness. Indeed, she went to trial previously without disclosing Davis's identity. And she did not change her position until the eve of her new trial date. While the denial of her continuance motion left her with a choice between "the right to present a complete defense and the right to remain silent," this tension was the product of her unjustifiable delay in revealing Davis's identity.

¶ 21 Absent a reasonable explanation for the delayed disclosure, we cannot conclude that the trial court abused its discretion by denying the motion. *See United States v. Nguyen*, 526 F.3d 1129, 1134 (8th Cir. 2008) (the trial court's discretion whether to grant or

8

deny a motion to continue "is at its zenith when the issue . . . is raised close to the trial date.")

### III.    Juror Challenges

### A.    For-Cause Challenge

¶ 22    Ryan contends that the trial court erred by failing to grant her motion to strike Juror R for cause.  The People disagree, arguing that the trial court correctly concluded that Juror R stated that he could consider all the evidence and could follow the controlling law.

### 1.    Additional Facts

¶ 23    During voir dire, Ryan's counsel asked Juror R whether he could consider all the evidence and not rely solely on the results of the breathalyzer test:

> [Ryan's Counsel]: Okay.  So you wouldn't be able to consider sort of all the evidence as a whole, that's really going to be hard for you if you have that test in front of you?
>
> [Juror R]: I just think, like, behaviors are more subjective.  Like, so if you give me a number, that — that's yes or no they were impaired or not.

¶ 24    Other potential juror members chimed in, discussing their views about the weight to give a BAC test.  After the conversation, Ryan's counsel asked Juror R follow up questions:

[Ryan's Counsel]: You had said that — a few minutes ago that that test would be sort of be all you need to hear to determine impairment, right? So same question to you. . . .

It sounds to me like you're saying, you know, you hear that test, that piece of evidence, and that is all you need to hear to make your decision about impairment and, you know, make . . . the case; is that fair to say?

[Juror R]: Yes. I guess I'm not familiar with the law —

[Ryan's Counsel]: Sure.

[Juror R]: [S]o to me, like, impairment means you, you know, blew or have a blood alcohol level above a certain guideline. So if that's the case, then it's going to be yeah.

. . .

[Juror R]: I would hear all of the evidence, but same as everyone else has said, I feel like if you — your blood alcohol level falls above what it's supposed to be —

[Ryan's Counsel]: Uh-huh.

[Juror R]: [T]hat you're legally impaired.

¶ 25    The court conducted rehabilitative questioning of Juror R:

[The Court]: [T]o follow up on some of the questions about the numbers that were referenced. This case — Ms. Ryan is charged with driving while ability impaired. There is a different charge in Colorado for driving under the influence. And for driving under the

influence, if we assume it's simply alcohol, driving under the influence of alcohol, the District attorney is required to prove that a person drove with a blood alcohol concentration above a particular number — actually, it would be .08 or higher. That is not the case here. That is not what Ms. Ryan is charged with.

I anticipate giving the jury an instruction that describes a permissive inference of what the jury may do if a number is presented of .05 to .08. And it is not an Instruction that tells you the crime is committed if a person's blood alcohol level is in that range. It is an instruction that you may infer certain things, but you're not required to. And, in fact, the jury must consider all of the evidence that's presented in the case.

So I want to follow up with that information. And [Juror R] with that information, do you believe that you can listen to any numbers that may be presented in this case and all of the other evidence and not make a determination until you've considered all of that evidence and engaged in deliberations with your fellow jurors at the end of the trial?

[Juror R]: I want to say yes, but if you can help me understand. Like, you're saying that if there was a number between .5 [sic] and .08, that doesn't automatically mean that the person is driving impaired; is that what you're saying?

[The Court]: That is what I'm saying. It does not necessarily mean that. There is a difference. . . .

There would be an instruction informing you of what inference you are allowed to make, but not required to make. The jury still has to decide whether the Prosecution has proven each element of the crime. So I don't know if that is helpful at all.

[Juror R]: That is helpful. Thank you.

. . .

[The Court]: So do you believe that you would consider that evidence and all of the other evidence?

[Juror R]: Yes.

[The Court]: Do you believe you'd shut down when you hear a number?

[Juror R]: I don't think so.

¶ 26 Ryan's counsel moved to strike Juror R for cause, expressing doubt that he could objectively consider all the evidence. The court denied the challenge.

## 2. Standard of Review and Applicable Law

¶ 27 We review a trial court's ruling on a for-cause challenge to a prospective juror for an abuse of discretion. *People v. Oliver*, 2020 COA 97, ¶ 7. The court's ruling will be reversed only if there is no record support for it. *People v. Palomo*, 272 P.3d 1106, 1108 (Colo. App. 2011).

12

¶ 28    To determine whether a potential juror should be struck for cause, the trial court must consider whether the potential juror will "be able to set aside any bias or preconceived notion and render an impartial verdict based on the evidence adduced at trial and the instructions given by the court." *People v. Clark*, 2022 COA 33, ¶ 14 (quoting *People v. Drake*, 748 P.2d 1237, 1244 (Colo. 1988)), *aff'd*, 2024 CO 55.

¶ 29    Defendants have a constitutional right to a fair trial, and an impartial jury is essential to protecting that right. *Id.* at ¶ 13. A court commits structural error if it denies a for-cause challenge by seating a juror who is biased against the defendant. *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 29. Thus, courts must sustain for-cause challenges when a prospective juror evinces enmity or bias toward the defendant. § 16-10-103(1)(j), C.R.S. 2024.

¶ 30    However, for-cause challenges are not meant to remove jurors who merely misunderstand the law, provided that "after explanation and rehabilitative efforts, the court believes that they can render a fair and impartial verdict based on the instructions given by the judge and the evidence presented at trial." *People v. Blassingame*, 2021 COA 11, ¶ 12; *see* § 16-10-103(1)(j).

### 3. Analysis

¶ 31    Ryan contends that the trial court abused its discretion by failing to remove Juror R for cause because his statements during voir dire compelled the inference that he could not decide the issues fairly due to his potential improper reliance on the BAC result.

¶ 32    The People reason that the trial court did not abuse its discretion by denying Ryan's for-cause challenge because after rehabilitative questioning by the court, Juror R demonstrated that he could follow the court's instructions and appropriately weigh the evidence. We agree.

¶ 33    A juror must be removed for cause if they evince "enmity or bias toward the defendant." § 16-10-103(1)(j). However, expressing doubt or confusion about the law does not presumptively mean that the juror is biased against the defendant. Here, Juror R initially demonstrated that he might improperly rely solely on the BAC test results. However, once the trial court explained the difference between DWAI and driving under the influence, and that the jury would be instructed on how the law works and what evidence to consider, Juror R said that he could and would follow the court's instructions. Because the record supports the trial court's

14

conclusion to deny Ryan's challenge to Juror R for cause, we discern no abuse of the trial court's discretion.

## B. *Batson* Challenge

¶ 34    Ryan contends that the trial court erred by denying her motion under *Batson v. Kentucky*, 476 U.S. 79 (1986), challenging the prosecution's peremptory strike of Juror A, the only Black[2] prospective juror.

### 1. Additional Facts

¶ 35    During jury selection, the prosecution exercised its third peremptory strike on Juror A, the only Black juror in either the presumptive panel or venire. Ryan's counsel immediately raised a *Batson* challenge.

¶ 36    In response, the prosecution first argued that there was no basis for a *Batson* challenge because there was "no pattern" of

---

[2] The trial court and parties refer to Juror A as an African American. Although "Black" and "African American" are frequently used to refer to people who are Black, the terms are not interchangeable. Not all Black people self-identify as African Americans. Because we do not know how Juror A self-identified, we refer to him as Black rather than African American. *See* U.S. Nat'l Insts. Health, *Style Guide*, https://perma.cc/Q3F3-XRPR ("Black is broader and more inclusive than African American — someone . . . could be born in Jamaica and live in the U.S. and identify as Black but not African American.").

using their peremptory challenges "for kicking people off." In the alternative, the prosecution offered the following race-neutral explanations for the peremptory: Juror A indicated on his juror questionnaire that he had a previous bad experience with law enforcement and the prosecution favored another prospective juror who was "more favorable to [them]."

¶ 37 The trial court found that Ryan's counsel made a prima facie showing of discrimination under *Batson* based on Juror A's race, expressly rejecting the notion that a party has the burden of demonstrating a "pattern of practice" at step one of the *Batson* process. Thus, the court found that there was a rebuttable presumption that the challenge may have been used for an improper purpose. The court then asked the prosecution if it had any other race-neutral reasons for striking Juror A.

¶ 38 The prosecutor responded that Juror A was an "unknown" and the prosecution had spoken to other panel members and understood their positions on the issues in the case, and preferred to have those other people sit as jurors rather than someone they had not spoken with. The prosecutor also cited Juror A's profession as an engineer as a reason for the strike because the district

attorney's office prefers to "try to avoid engineers as much as possible" because "they don't look favorably on our cases."

¶ 39    Ryan's counsel countered that two white prospective jurors who were not excused — Juror R and Juror G — indicated they also had previous negative experiences with law enforcement. Because the prosecution did not move to strike either of them, and had not even spoken with Juror A, Ryan's counsel argued that the peremptory strike of Juror A was pretextual.

¶ 40    After hearing from both parties, the court initially clarified that the prosecution had the opportunity to speak to Juror A but elected not to do so. Ultimately, the court concluded that the people presented a race-neutral rationale for striking Juror A, reasoning as follows:

- Juror A indicated that he had a prior bad experience with law enforcement.

- Juror A indicated he was an engineer, and the prosecution did not like to empanel engineers in cases like this.

- Juror A's negative experience with law enforcement was distinguishable from Juror R's because the prosecution questioned Juror R about his bad experience and concluded

17

that Juror R's previous negative experience would not negatively impact the prosecution. To the contrary, Juror R's views were favorable to the prosecution.

- The prosecution wanted to exercise its last peremptory challenge to strike Juror A so that a prospective juror that they saw as more favorable to the prosecution would be seated on the panel.

¶ 41    The trial court also noted that, even though it is not a dispositive factor, the court would have had "significantly greater concerns if [Ryan] was a [Black] person."

## 2.    Standard of Review and Applicable Law

¶ 42    "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (citation omitted). In particular, the Equal Protection Clause forbids a party from using peremptory strikes to excuse potential jurors on account of race. *Batson*, 476 U.S. at 89.

¶ 43    When a defendant raises a *Batson* challenge based on race, a trial court applies a three-step analysis. *People v. Wilson*, 2015 CO 54M, ¶ 10. First, the defendant must make a prima facie showing that the prosecutor struck the prospective juror based on race. *Id.*

To do so, the defendant must show that (1) the prosecutor struck a juror of a cognizable racial group and (2) the totality of the facts gives rise to an inference of purposeful discrimination. *See Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998). "[M]erely identifying cognizable groups to which the excluded juror might have belonged" is insufficient, without more, to establish a prima facie showing of purposeful discrimination. *People v. Morales*, 2014 COA 129, ¶ 25. But if the totality of the relevant circumstances raises an inference of discriminatory motivation, the objecting party has satisfied their step-one burden. *Batson*, 476 U.S. at 96.

¶ 44 At step two, the burden shifts to the prosecution to proffer a race-neutral reason for excusing the prospective juror. *See People v. Ojeda*, 2022 CO 7, ¶ 24. A race-neutral explanation is one that is based on something other than the prospective juror's race. *Id.*

¶ 45 At step three, after the objecting party has had a chance to rebut the proffered race-neutral justification, the trial court must decide the ultimate question of whether the objecting party has established purposeful discrimination. *Id.* at ¶ 27. Purposeful discrimination is established if "the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the

basis of race." *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019). The trial court must consider all the circumstances bearing on the issue of purposeful discrimination, including the prosecutor's "demeanor, the reasonableness of the proffered race-neutral explanations, and whether the rationales are rooted in accepted trial strategy." *People v. Madrid*, 2023 CO 12, ¶ 34. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Wilson*, ¶ 14 (citation omitted).

¶ 46 The trial court's ruling at step three is a question of fact, and we therefore review for clear error. *Ojeda*, ¶ 30. A step-three determination is clearly erroneous only if it finds no support in the record. *People v. Beauvais*, 2017 CO 34, ¶ 22. Thus, we accord the trial court's ruling "great deference and will only reverse under 'exceptional circumstances.'" *Id.* at ¶ 25 (citation omitted).

### 3. Analysis

¶ 47 Ryan argues that the trial court erred by (1) failing to find that the prosecution's reasons for the peremptory strike were pretextual and (2) impermissibly considering Ryan's race when it made its findings. We address each contention in turn.

## a.     Pretextual Claims

¶ 48    Ryan argues that the prosecution's reliance on Juror A's questionnaire response about a prior negative experience with law enforcement was pretextual because two white jurors also responded that they had negative experiences with law enforcement and the prosecution did not move to strike them.  Ryan also argues that the prosecution's other proffered explanation for the strike — an alleged preference not to empanel engineers — does not pass muster as a race-neutral explanation because the prosecution did not strike any of the other three prospective jurors who indicated that they were engineers.

¶ 49    The People disagree, noting that the other two jurors who reported they had negative experiences with law enforcement were differently situated than Juror A: Juror G never made it to the panel, and the prosecution questioned Juror R about his previous experience and determined that it would not negatively impact the prosecution.  As to the other prospective jurors who identified as engineers, the People note that two of them did not make it onto the panel, and Ryan struck the other juror who identified as an engineer with her second peremptory challenge.

¶ 50     As noted, we review step three of a trial court's *Batson* analysis for clear error, which means that reversal is only appropriate if the finding was clearly erroneous.  *Ojeda*, ¶ 30.  Even though we agree with Ryan that the prosecution's proffered explanations for striking Juror A are a bit thin, the trial court's rationale has record support and is therefore not clearly erroneous.

¶ 51     Juror A wrote that his "wife was insulted by an officer, [who] said 'are you blind.'"  Ryan contends that this experience alone is insufficient for the prosecution to conclude that striking Juror A was appropriate considering that Juror R and Juror G's responses were similarly mild.  However, as the People note, the prosecution questioned Juror R and explored the extent of his alleged negative experience, which was that a law officer wrongly cited him when he was around twenty years old.

¶ 52     Furthermore, any concerns that the prosecution may have had about Juror R were assuaged by his seemingly favorable views toward the prosecution.  It is permissible for either party to prefer a juror who they think will respond favorably to their arguments.  Moreover, Juror G never made it to the panel, so the prosecution had no reason to vet him further.  The lack of questioning of Juror

A, combined with the belief that Juror R favored the prosecution's side, adequately distinguishes him from Juror A as it relates to the seemingly disparate treatment.

¶ 53    The second proffered explanation, that the district attorney's office prefers to avoid engineers, was a race-neutral explanation for striking Juror A.  The prosecutor indicated that there is an office-wide preference against selecting engineers for these kinds of cases. Two of the potential jurors who indicated that they were engineers never made it to the panel.  Ryan struck the remaining engineer on the panel, thus dissipating any suggestion that using the peremptory on Juror A was not exercised on a race-neutral basis.

¶ 54    In sum, there is record support for the trial court's factual finding that the peremptory challenge of Juror A was not racially motivated.  Thus, we cannot conclude that the court clearly erred in so finding.  *See Ojeda*, ¶ 30.

b.    The Trial Court's Alleged Improper Reliance on Race

¶ 55    Finally, Ryan claims that the trial court misapplied the law when it said that if Ryan was Black, it would have "significantly greater concerns" about allowing the prosecutor to strike Juror A.

¶ 56    In support of her contention, Ryan relies on *Powers v. Ohio*, which held that criminal defendants have standing to raise a *Batson* challenge even if the juror does not share the same race as a struck juror.  499 U.S. 400, 415 (1991) ("[A] defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race.").  This is true whether the dismissed juror is of the same or a different race than the defendant.  *Flowers*, 588 U.S. at 301 ("A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races.").  Thus, Ryan had standing to pursue her *Batson* claim regardless of whether she was the same race as Juror A.

¶ 57    In view of these authorities, the trial court's notation that Juror A and Ryan were not of the same race was inartful.  Nevertheless, we conclude that the trial court's misapplication of the law did not impact its decision to reject Ryan's *Batson* challenge.  As the People note, the trial court did not state that removing Juror A was acceptable because he was not the same race as Ryan.  Moreover, as we previously noted, the trial court concluded, with record support, that the peremptory challenge to

24

Juror A was not racially motivated. The court's improvident observation about potentially greater concerns if Ryan was the same race as Juror A does not negate that conclusion. Thus, we discern no basis for reversal.

## IV. Reasonable Doubt Instruction

¶ 58 Ryan also contends that the trial court abused its discretion by denying her proposed reasonable doubt instruction and instead giving the reasonable doubt instruction from the 2022 Colorado Model Criminal Jury Instructions (COLJI). We disagree.

### A. Additional Background

¶ 59 Prior to 2022, the COLJI contained the following definition of reasonable doubt:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

*People v. Melara*, 2025 COA 48, ¶ 11; COLJI-Crim. E:03 (2021). In 2022, the Colorado Supreme Court's Model Jury Instruction's Committee revised the model reasonable doubt instruction and

combined it with the presumption of innocence and burden of proof into a single model instruction.  *See* COLJI-Crim. E:03 (2022).  The 2022 instruction reads as follows:

> Every person charged with a crime is presumed innocent.  This presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all the evidence, you are convinced that the defendant is guilty beyond a reasonable doubt.
>
> The burden of proof in this case is upon the prosecution.  The prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged.  This burden requires more than proof that something is highly probable, but it does not require proof with absolute certainty.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt.  But if you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.
>
> After considering all the evidence, if you decide the prosecution has proven each of the elements of a crime charged beyond a reasonable doubt, you should find the defendant guilty of that crime.

> After considering all the evidence, if you decide
> the prosecution has failed to prove any one or
> more of the elements of a crime charged
> beyond a reasonable doubt, you should find
> the defendant not guilty of that crime.

(Emphasis added.) The trial court's reasonable doubt instruction was consistent with this 2022 COLJI instruction.

### B.    Standard of Review and Applicable law

¶ 60    A trial court has a duty to properly instruct the jury on the applicable law. *People v. Claycomb*, 2025 COA 36, ¶ 14 (citation omitted). We review de novo whether the trial court's instructions, read as a whole, correctly instructed the jury on the controlling law. *Tibbels v. People*, 2022 CO 1, ¶ 22. But we review "a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion." *People v. Payne*, 2019 COA 167, ¶ 16.

¶ 61    Model jury instructions are not law and are not authoritative, and courts are not bound by them. *People v. Salazar*, 2023 COA 102, ¶ 22 (citing *Krueger v. Ary*, 205 P.3d 1150, 1154 (Colo. 2009)). Thus, using a model instruction does not provide trial courts with "a safe harbor that insulates instructional error from reversal." *Melara*, ¶ 21 (quoting *Garcia v. People*, 2019 CO 64, ¶ 22).

27

¶ 62    In criminal cases, the prosecution has the burden of proving

every element of the crime charged beyond a reasonable doubt.

*Johnson v. People*, 2019 CO 17, ¶ 10.  If the instructions provided

by the court lower the prosecution's burden of proof, there is

structural error that mandates reversal.  *Melara,* ¶ 20.  We employ

a functional test to determine if "there is a reasonable likelihood

that the jury understood a contested instruction, in the context of

the instructions as a whole and the trial record, to allow a

conviction based on a standard lower than beyond a reasonable

doubt."  *Tibbels,* ¶ 36.

## C.    Analysis

¶ 63    At trial, Ryan objected to the tendered instruction, arguing

that it lowered the prosecution's burden of proof.  Specifically, Ryan

objected to the phrase that allowed the jury to convict if it was

"firmly convinced" of Ryan's guilt, and the language that permitted

an acquittal only if there "was a real possibility" that Ryan was not

guilty.  But Ryan does not discuss either of these phrases in the

opening brief, so we do not address them further.

¶ 64    Ryan's sole contention on appeal is that the court's instruction

did not contain important language from the most recent Tenth

Circuit Federal Instruction. *See* Tenth Cir. Crim. Pattern Jury Instruction 1.05 (2025). Specifically, Ryan notes that the trial court's reasonable doubt instruction did not include the phrase encouraging the jury to make a careful and impartial consideration of all of the evidence in the case or the phrase directing the jury that, if there is a real possibility that the defendant is not guilty, you must give her "the benefit of the doubt" and find her not guilty. *See id.* Thus, she argues, the trial court's instruction should not be approved based on federal precedent interpreting federal model instructions, citing *United States v. Taylor*, 997 F.2d 1551, 1557 (D.C. Cir. 1993) (interpreting Pattern Criminal Jury Instruction 28 (Federal Judicial Ctr. 1988)). But neither this argument, nor the remainder of Ryan's appellate brief, addresses the controlling question: whether the omission of these two phrases lowered the prosecution's burden of proof.

¶ 65    We are not aware of any authority stating that the omission of these two phrases lowered the prosecution's burden to prove Ryan's guilt beyond a reasonable doubt. Moreover, the trial court's instruction advised the jury that Ryan was presumed innocent, and that presumption should be given effect unless, after considering all

29

the evidence, it was convinced that Ryan was guilty beyond a reasonable doubt. It advised the jury that the prosecution must prove every element of the crime, and that it must be firmly convinced of Ryan's guilt. And the instruction told the jury that it must find Ryan not guilty if the prosecution has failed to prove any element of the offense. We fail to see how omitting the two noted phrases lowered the prosecution's burden of proof.

¶ 66 Finally, although the cases were announced after the parties completed their appellate briefs, we note that multiple divisions of this court have concluded that the 2022 COLJI reasonable doubt instruction did not lower the prosecution's burden of proof. *See, e.g., Melara*, ¶ 48; *People v. Schlehuber*, 2025 COA 50, ¶ 19.[3] We agree with those holdings, and therefore reject Ryan's argument that the trial court's instruction impermissibly lowered the prosecution's burden of proof.

---

[3] We also note that the divisions in *People v. Melara*, 2025 COA 48 ¶ 48 and *People v. Schlehuber*, 2025 COA 50 ¶ 20, agree that absent further direction from the supreme court, the better practice is for trial courts to use the current COLJI reasonable doubt instruction, which informs the jury that, "A reasonable doubt can be based on the evidence presented or the lack of evidence presented." COLJI-Crim. E:03 (2024). We agree.

30

## V.  Cumulative Error

¶ 67    Finally, Ryan contends that the cumulative impact of the asserted errors requires reversal.  "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not.  Stated simply, cumulative error involves cumulative prejudice."  *Howard-Walker v. People*, 2019 CO 69, ¶ 25 (citation omitted).  Because we find no error, Ryan's cumulative error claim necessarily fails.

## VI.  Disposition

¶ 68    The judgment is affirmed.

JUDGE FOX and JUDGE HARRIS concur.